FILED
2026 Jul-28  PM 03:19
U.S. DISTRICT COURT
N.D. OF ALABAMA

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| CHRISTOPHER J. DIXON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 2:24-cv-00183-NAD |
| | ) | |
| CITY OF BIRMINGHAM, | ) | |
| | ) | |
| Defendant. | ) | |

### MEMORANDUM OPINION AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

For the reasons stated below and on the record in the oral argument motion hearing, the court **GRANTS** Defendant City of Birmingham's motion for summary judgment.  Doc. 36.  The court separately will enter final judgment.

## BACKGROUND

### A.   Procedural background

On February 15, 2024, Plaintiff Christopher J. Dixon initiated this action by filing a complaint against the Defendant City.  Doc. 1.  Plaintiff Dixon's complaint alleged three claims for relief:  (1) race discrimination pursuant to Title VII; (2) race discrimination pursuant to 42 U.S.C. §§ 1981 and 1983; and (3) retaliation pursuant to Title VII and 42 U.S.C. §§ 1981 and 1983.  Doc. 1 at 4–9.

On April 26, 2024, the City moved to dismiss only the retaliation claim.  Doc. 3.  After an oral argument hearing, the court granted the City's motion to dismiss the

1

retaliation claim, and granted Dixon leave to amend his complaint.  Doc. 20.  On September 24, 2024, Dixon filed a notice of voluntary dismissal (Doc. 21), so Dixon's retaliation claim was dismissed (Doc. 22), and the case proceeded on only his two discrimination claims (Doc. 22).

The complaint alleges that, in May 2022, Dixon "was informed that he was to be transferred from his Narcotics Detective position on the Interdiction Team."  Doc. 1 at 3.  The complaint alleges that white officers who were members of the Interdiction Team "and who were transferred received desirable positions within the criminal investigation division, including the regular narcotics unit."  Doc. 1 at 3.

The complaint also alleges that on May 16, 2022, Dixon "filed a [complaint] with the City of Birmingham's Human Resources Department stating that his transfer was discriminatory in that he was slated to be transferred to a less desirable position within the Birmingham Police Department's [BPD] patrol division, while white officers received more prestigious and desirable re-assignments."  Doc. 1 at 3. The complaint alleges that on June 6, 2022, Dixon's complaint "regarding discriminatory re-assignments was ignored and he was permanently assigned to the patrol division."  Doc. 1 at 3.

On January 5, 2026, the City filed this summary judgment motion (Doc. 36), with a supporting brief (Doc. 37), and evidentiary materials (Doc. 35).  The parties fully briefed the motion.  *See* Doc. 42 (Dixon's opposition); Doc. 43 (Dixon's

evidentiary materials); Doc. 43 (City's reply); Doc. 38 (briefing schedule).  The parties have consented to magistrate judge jurisdiction (Doc. 15), and the court held an oral argument hearing on this summary judgment motion.  *See* minute entry, entered: 05/19/2026; Doc. 44 (order setting hearing).

## B.    Factual background

On this summary judgment motion, the following facts are undisputed:  Dixon is a black police officer who began working for the BPD in 2017.  Doc. 37 at 3; Doc. 42 at 7.  In the spring 2022, Dixon was assigned to the Interdiction Team, which was responsible for patrolling interstates to search for narcotics.  Doc. 35-1 at 10; Doc. 37 at 3; Doc. 42 at 7.

In June 2022, the Interdiction Team was disbanded.  Doc. 37 at 3–5; Doc. 42 at 10.  The City stated that the disbandment of the Interdiction Team was due to staffing shortages in the Patrol Bureau, and all eight Interdiction Team officers were reassigned to Patrol.  Doc. 37 at 3; Doc. 42 at 7, 10.  At the time of the reassignment, three of the eight officers voluntarily chose to retire.  Doc. 37 at 3.

On August 18, 2022, Dixon filed a charge of discrimination with the Equal Employment Opportunity Commission (EEOC), which states, in relevant part,

> In May 2022, I was notified that I was to be transferred out of my assigned position as a narcotics detective with the interdiction unit. Despite open positions in various areas of the criminal investigation division, including the narcotics unit, I was transferred to a less desirable position with the patrol division. . . . I believe that I have been discriminated against by the employer based on my protected group –

3

race:  African American – violation of Title VII of the Civil Rights Act of 1964, as amended.

Doc. 1-1.  On November 17, 2023, the EEOC issued a determination and notice of rights on Dixon's charge.  Doc. 1-2.

### C.    Legal background

Title VII prohibits employers from "discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).

In the Eleventh Circuit, "so long as a plaintiff offers enough evidence for a reasonable jury to infer illegal discrimination, [his] Title VII claim will survive summary judgment."  *McCreight v. AuburnBank*, 117 F.4th 1322, 1340 (11th Cir. 2024).

"Section 1981 prohibits intentional race discrimination in the making and enforcement of public and private contracts, including employment contracts."  *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).   "Race discrimination claims under the Equal Protection Clause and 42 U.S.C. § 1981, brought through 42 U.S.C. § 1983, are subject to the same framework as race discrimination claims brought under Title VII."  *Cobb v. Floyd*, No. 21-10535, 2022 WL 856074, at *2 (11th Cir. March 23, 2022) (citing *Lewis v. City of Union City, Ga.*, 918 F.3d 1213, 1220 n.5 (11th Cir. 2019)).  "Thus, those claims 'rise and fall'

4

with the success or failure of a plaintiff's Title VII claim." *Id.* (citing *Flowers v. Troup Cty. Sch. Dist.*, 803 F.3d 1327, 1335 n.7 (11th Cir. 2015)).

## LEGAL STANDARD

Summary judgment is appropriate when the movant establishes that "there is no genuine dispute as to any material fact," and that the movant "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A material fact is one that might affect the outcome of the case. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[1] And a dispute about a material fact is "genuine," if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.*

To avoid summary judgment, the nonmovant must go beyond mere allegations to offer specific facts creating a genuine dispute for trial. *Celotex*, 477 U.S. at 324–25. The court's responsibility is not to "weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249. The court must construe all evidence and

---

[1] *Accord, e.g.*, *Celotex*, 477 U.S. at 322–23 ("[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.").

draw all reasonable inferences in the nonmovant's favor. *Centurion Air Cargo, Inc. v. UPS Co.*, 420 F.3d 1146, 1149 (11th Cir. 2005).

Where there is no genuine dispute of material fact for trial, the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a), (c).

## DISCUSSION

**I.    There is no genuine dispute of material fact for trial on Dixon's race discrimination claim pursuant to Title VII.**

There is no fact issue for trial on Dixon's Title VII race discrimination claim. As a preliminary matter, no reasonable jury could find or infer that the City discriminated against Dixon when he was reassigned in June 2022 from the disbanded Interdiction Team to Patrol.

As explained above, it is undisputed that, in June 2022, the Interdiction Team was disbanded (Doc. 37 at 3–5; Doc. 42 at 10), and that all eight of the officers on the Interdiction Team were reassigned to Patrol (Doc. 37 at 3; Doc. 42 at 7, 10). It also is undisputed that, at the time of that reassignment, three of the eight officers voluntarily chose to retire, and that if those three officers had not retired they also would have been reassigned to Patrol. Doc. 37 at 3; Doc. 35-2 at 2 (Declaration of Scott R. Thurmond, Chief of Police of the BPD) ("[A]ll the officers who were on the Interdiction Team were re-assigned to the Patrol Bureau . . . . The only exception to all of the Interdiction Team Members being reassigned to the Patrol Bureau are three Officers, Joe Fenison, Jr., William Harrington, and Robert Walker, Jr. who

6

voluntarily chose to retire.  If those Officers had not retired, they also would have been reassigned to the Patrol Bureau.").

Thus, while Dixon alleged in his EEOC charge that the City discriminated against him because "[he] was transferred to a less desirable position with the patrol division" (Doc. 1-1), every officer on the Interdiction Team was reassigned to Patrol. Because the entire Interdiction Team was disbanded in June 2022 and reassigned to Patrol (or retired), no reasonable jury could find or infer that Dixon's reassignment to Patrol was discriminatory.

Dixon appears to recognize as much, arguing instead that "all Interdiction Unit members were initially reassigned to patrol," but that the "court[] must examine the full sequence of events—not isolate a single moment."  *See* Doc. 42 at 15 (citation omitted).

Dixon argues that "the record here [must be] considered holistically."  Doc. 42 at 13.[2]  But, even construing all evidence and reasonable inferences in Dixon's

---

[2] For instance, Dixon argues that "[w]hen the record here is considered holistically— including the 2020 leapfrogging of a higher-ranked Black officer, inconsistent explanations for disbandment, selective restoration of white officers, unexplained scoring downgrades, and a discretionary system operating outside Human Resources oversight—a jury could reasonably conclude that race influenced how reassignment authority was exercised" (Doc. 42 at 13–14), and that "the mosaic includes: (1) leapfrogging of a higher-ranked African-American officer; (2) detective assignment only after complaint; (3) disbandment under shifting rationales; (4) selective reassignment of white officers; (5) continued exclusion of Dixon; (6) unexplained scoring downgrade; and, (7) subjective scoring system lacking oversight.  Taken together, these facts permit a reasonable inference of

favor (as the court must at this stage, *see Centurion Air Cargo*, 420 F.3d at 1149), no reasonable jury could find or infer that the City discriminated against Dixon.

Primarily, Dixon argues that—even though all eight of the officers on the Interdiction Team either retired or were assigned to Patrol—the City later reassigned white comparators to more favorable positions, while Dixon remained in Patrol. But no reasonable jury could find or infer that the City treated similarly situated employees outside of Dixon's protected class more favorably.

"[O]rdinarily a similarly situated comparator and the plaintiff will:  have engaged in the same basic conduct or misconduct, be subject to the same employment policies, have the same supervisor(s), and share an employment or disciplinary history." *Jenkins v. Nell*, 26 F.4th 1243, 1249 (11th Cir. 2022).

Again, it is undisputed that there were eight officers on the Interdiction Team, when it was disbanded in June 2022:  (1) Dixon; (2) Joe Fenison, Jr.; (3) William Harrington; (4) Robert Walker, Jr.; (5) Michael Turner; (6) Larry Foster; (7) Chad Hallman; and (8) Todd Southerland.  *See, e.g.*, Doc. 37 at 5.

Fenison, Harrington, and Walker retired.  *See, e.g.*, Doc. 37 at 5; Doc. 35-2 at 2.

Dixon does not identify Turner—who is white, and who was reassigned to Patrol—as a comparator or otherwise argue that any evidence related to Turner is

---

discriminatory intent" (Doc. 42 at 21).

relevant on this motion.  *See, e.g.*, Doc. 37 at 5.

Dixon testified in his deposition that Foster—who is black, and who was reassigned to Patrol—later was "sent to narcotics over [Dixon]."  Doc. 43 at 3; Doc. 35-1 at 41.

In this regard, Dixon has identified as comparators the following:  Adam Smith, Hallman, and Southerland.  *See* Doc. 42 at 15–16.

But, because Dixon acknowledges that Smith was not one of the eight "member[s] of the Interdiction Unit" (Doc. 42 at 16), a jury could not consider Smith as a similarly situated comparator in this case.  *See, e.g.*, *Jenkins*, 26 F.4th at 1249.

With respect to Hallman and Southerland (both of whom are white), Dixon argues that—after the disbandment of the Interdiction Team—Southerland and Hallman eventually "both received assignments to other units."  Doc. 42 at 15.

However, the City has introduced evidence—and it is undisputed—that Hallman was assigned to Patrol from June 4, 2022, until December 17, 2023; Hallman transferred to Narcotics on December 18, 2023.  Doc. 43-1 at 2 (Declaration of Rodarius Mauldin, Deputy Chief of Police of the BPD, summarizing staffing records).

Likewise, Southerland was assigned to Patrol from June 4, 2022, until October 20, 2023.  Doc. 43-1 at 1–2.  While Southerland transferred to Tactical Operations as a Motor Scout on October 21, 2023, he transferred back to Patrol on June 15,

2024, before transferring again to Tactical Operations as a Motor Scout on January 25, 2025.  Doc. 43-1 at 2.

So, after June 2022, both Hallman and Southerland were assigned to Patrol for more than a year—Hallman until December 2023, and Southerland until October 2023.  Doc. 43-1 at 1–2.  Southerland then was reassigned again to Patrol for another seven months from June 2024 to January 2025.  Doc. 43-1 at 1–2.  Given these undisputed facts, no reasonable jury could find or infer that the City more favorably treated any similarly situated comparator.

Moreover (even if this comparator evidence were sufficient to create a fact issue for trial, and it is not), Dixon's assertions regarding eventual officer reassignments and his alleged failures to promote—after the June 2022 disbandment of the Interdiction Team and assignment of all remaining officers to Patrol—are beyond the scope of his EEOC charge and any reasonable investigation into that charge.

For example, Dixon argues that, after the Interdiction Team was disbanded, white officers later were "restored to specialized assignments while Dixon was not." Doc. 42 at 15–16.  Dixon argues that, in August 2022, he applied for a vacancy within the Investigative Bureau but was not selected.  Doc. 42 at 11.  Dixon also argues that, in May 2023, he applied and interviewed for a vacancy within the Special Operations Bureau, but he was not selected.  Doc. 42 at 11–12.  Dixon argues

10

further that, in February 2024, he applied for a detective position, but was not selected. Doc. 42 at 12.

While the court "must liberally construe EEOC charges that are prepared without the assistance of counsel, a plaintiff's civil complaint remains 'limited by the scope of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination.'" *Green v. Elixir Indus., Inc.*, 152 F. App'x 838, 840 (11th Cir. 2005) (citing *Gregory v. Georgia Dep't of Hum. Res.*, 355 F. 3d 1277, 1279–80 (11th Cir. 2004)); *accord Sanchez v. Standard Brands, Inc.*, 431 F.2d 455, 466 (5th Cir. 1970) (old Fifth Circuit) (cited by Dixon for the rule that "the 'scope' of the judicial complaint is limited to the 'scope' of the EEOC investigation which can reasonably be expected to grow out of the charge of discrimination").

But, under *Sanchez*, "the crucial element of a charge of discrimination is the factual statement contained therein." 431 F.2d at 466.

Dixon's EEOC charge only contains facts regarding his transfer from the Interdiction Team to Patrol in June 2022, and does not contain any facts about any subsequent officer reassignments or alleged failures to promote. As explained above, Dixon's EEOC charge alleges, "I was notified that I was to be transferred out of my assigned position as a narcotics detective with the interdiction unit. Despite open positions in various areas of the criminal investigation division, including the narcotics unit, I was transferred to a less desirable position with the patrol

11

division. . . . I believe that I have been discriminated against by the employer." Doc. 1-1.

While Dixon's EEOC charge also alleges a "Continuing Action," the charge identifies "05/13/2022" as the earliest date discrimination took place, and "06/03/2022" as the latest date—i.e., the June 2022 disbandment of the Interdiction Team and reassignment of all remaining officers to Patrol. Doc. 1-1. And the charge is dated "08/18/2022." Doc. 1-1.

As such, Dixon filed his EEOC charge—in August 2022—more than 1 year before Hallman or Southerland was reassigned out of Patrol (December 2023 and October 2023, *see* Doc. 43-1 at 1–2), approximately 9 months before Dixon applied for a position in the Special Operations Bureau (May 2023, *see* Doc. 42 at 11–12), and approximately 18 months before Dixon applied for a detective position (February 2024, *see* Doc. 42 at 12), and the charge contains no facts about Dixon's application for a position in the Investigative Bureau (August 2022, Doc. 42 at 11).

A plaintiff's "claims are allowed if they amplify, clarify, or more clearly focus the allegations in the EEOC complaint, but . . . new acts of discrimination are inappropriate." *Gregory*, 355 F. 3d at 1279–80. And, in this regard, "[a]n employer's failure to promote is a discrete act or single occurrence and therefore the continuing violation doctrine does not apply. For [a plaintiff's] claims to be timely, [the plaintiff] [is] required to file his EEOC complaint within 180 days of each

12

discrete employment decision." *Stuart v. Jefferson Cty. Dep't of Hum. Res.*, 152 F. App'x 798, 800–01 (11th Cir. 2005) (citation omitted); *see National R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) ("[D]iscrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges. Each discrete discriminatory act starts a new clock for filing charges alleging that act.").[3]

Consequently, any claim or assertion regarding the City's alleged failure to promote Dixon in August 2022, May 2023, or February 2024 is factually remote and discrete from his transfer from the Interdiction Team to Patrol in June 2022 and was not properly exhausted in his August 2022 EEOC charge. *See* Doc. 1-1.

Dixon also points to "scoring downgrades" related to the alleged failures to promote, and "a discretionary system operating outside Human Resources oversight." Doc. 42 at 14. But there is no evidence based on which a reasonable

---

[3] *Accord Woods v. Lockheed Martin Corp.*, No. 1:18-CV-3501-LMM-CCB, 2019 WL 13078831, at *6 (N.D. Ga. Sept. 4, 2019) ("Plaintiff did not include a failure-to-promote claim in her EEOC charge . . . . Therefore, Plaintiff's failure-to-promote claim is unexhausted because the charge did not put the EEOC and Defendant on notice of this claim."), *aff'd*, No. 21-13882, 2022 WL 2972852 (11th Cir. July 27, 2022); *Anderson v. Embarq/Sprint*, 379 F. App'x 924, 927 (11th Cir. 2010) ("[The plaintiff] did not include a failure to promote claim in his EEOC charges. In his EEOC charges, [the plaintiff] complained only of race discrimination, age discrimination, disability discrimination, and retaliation. . . . Because this new allegation of discrimination does not clarify the allegations in his EEOC charges, the district court properly dismissed this claim for failure to exhaust administrative remedies.").

13

jury could find or infer discrimination as to the scoring or system for promotions, and "inferences in favor of a plaintiff can be based only on evidence—not on speculation." *Martin v. Financial Asset Mgmt. Sys., Inc.*, 959 F.3d 1048, 1058 (11th Cir. 2020).

Similarly, Dixon argues that he was assigned to the Narcotics Division only after filing an internal complaint alleging race discrimination in 2020, and that "those facts are properly considered as background evidence bearing on the City's later actions." *See, e.g.*, Doc. 42 at 5.  But "Dixon does not seek relief for the initial 2020 staffing decisions" (Doc. 42 at 5), and Dixon testified in his deposition that the decisionmakers in 2020 left the BPD before the Interdiction Team was disbanded in June 2022 (Doc. 35-1 at 13–14).

Furthermore, there is no direct evidence of discrimination.  Dixon testified in his deposition that he never heard a supervisor or manager make race-based statements or use racial slurs, and that he never saw any racially offensive symbols displayed at work.  Doc. 35-1 at 16.  Rather, Dixon argues that the totality of the circumstantial evidence in the record could support a reasonable inference of discrimination. *See, e.g.*, Doc. 42 at 23–24; *Berry v. Crestwood Healthcare LP*, 84 F.4th 1300, 1311 (11th Cir. 2023) ("To survive summary judgment, the employee must present a story, supported by evidence, that would allow a reasonable jury to find that the employer engaged in unlawful [discrimination] against the employee.").

14

In his deposition, Dixon testified that he believed Deputy Ron Sellers, Chief of Patrol, "disbanded the interdiction unit specifically to get [Dixon] down to patrol." Doc. 35-1.  But, when Dixon was asked if he believed that Sellers had a racial motivation in disbanding the Interdiction Team, Dixon responded, "I wouldn't say he had a racial motivation."  Doc. 35-1 at 15–16.

In fact, the record evidence shows that the Interdiction Team was disbanded because the Patrol Bureau was understaffed.  In his deposition, Chief Michael Pickett testified that, "at the time, there was a critical need for personnel in Patrol, and [the Interdiction Team], as well as several other units, were sent back to patrol to assist with the numbers in staffing."  Doc. 41-1 at 11; *see* Doc. 41-1 at 26, 28.

Dixon asserts that there were "inconsistent explanations for disbandment" of the Interdiction Team (Doc. 42 at 13–14), arguing that Pickett "offered multiple explanations for dissolving the Interdiction Unit:  patrol staffing shortages and performance issues within the unit."  Doc. 42 at 17; *see also Springer v. Convergys Customer Mgmt. Grp. Inc.*, 509 F.3d 1344, 1348 (11th Cir. 2007) (a plaintiff can show pretext "by revealing such weaknesses, implausibilities, inconsistencies, incoherencies or contradictions in [the employer's] proffered legitimate reasons for its actions that a reasonable factfinder could find them unworthy of credence" (citation and quotation marks omitted)).

While Pickett did testify that he had "heard discussion of [the Interdiction

15

Team's] performance, and it ha[d] not always been good," Pickett then confirmed that the disbandment of the Interdiction Team "was about staffing" and had nothing to do with performance.  Doc. 41-1 at 26.  Pickett also testified that other officers outside of the Interdiction Team were reassigned to Patrol during the same time period, stating that "there were several black officers and white officers that were reassigned from the Crossplex assignment and the City Jail assignment all pushed back to Patrol during that time."  Doc. 41-1 at 29.

## II.    There is no genuine dispute of material fact for trial on Dixon's race discrimination claim pursuant to 42 U.S.C §§ 1981 and 1983.

As explained above, "[t]he analysis under [42 U.S.C. §§ 1981 and 1983] claims mirrors that under Title VII." *Brown v. Alabama Dep't of Transp.*, 597 F.3d 1160, 1174 n.6 (11th Cir. 2010) (citations omitted).  When "a plaintiff attempts to use Title VII and 42 U.S.C. § 1983 as parallel remedies for the same allegedly unlawful employment discrimination, the elements of the two causes of action are identical." *Johnson v. Miami-Dade Cty.*, 948 F.3d 1318, 1325 (11th Cir. 2020).  Thus, because there is no genuine dispute as to any material fact on Dixon's discrimination claim pursuant to Title VII, there can be no genuine dispute on his claim pursuant to §§ 1981 and 1983.

## CONCLUSION

For the reasons stated above, the City's summary judgment motion (Doc. 36) is **GRANTED**.    Dixon's claims are **DISMISSED WITH PREJUDICE**.

16

Separately, the court will enter final judgment.

**DONE** and **ORDERED** this July 28, 2026.

_____
**NICHOLAS A. DANELLA**
UNITED STATES MAGISTRATE JUDGE